ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL
OATA-2023-131[1]

| | | |
|---|---|---|
| ÁNGEL AREIZAGA SOTO<br><br>Apelante<br><br>v.<br><br>MAPFRE PRAICO INSURANCE COMPANY<br><br>Apelado | KLAN202300538 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm. SJ2022CV07695<br><br>Sobre: Reclamación de Cubierta |

Panel integrado por su presidenta, la Jueza Grana Martínez, el Juez Rodríguez Flores y el Juez Cruz Hiraldo.

Cruz Hiraldo, Juez Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 27 de junio de 2024.

Comparece la parte apelante, Ángel Areizaga Soto (en adelante, "señor Areizaga Soto") para solicitarnos que se revise y revoque la *Sentencia* emitida el 15 de mayo de 2023 y notificada a las partes el 16 de mayo del mismo año por el Tribunal de Primera Instancia, Sala Superior de San Juan, en la cual declaró *Ha Lugar* a la *Moción de Sentencia Sumaria* y desestimó con perjuicio la primera demanda enmendada presentada en contra de los apelados.

Examinada la solicitud de autos, el "Alegato de la Parte Apelada", la totalidad del expediente y el estado de derecho aplicable ante nuestra consideración, revocamos el dictamen mediante los fundamentos que exponemos a continuación.

**-I-**

Los hechos que nos ocupan tienen su génesis en un pleito independiente y anterior, es importante señalar que es relacionado y, en consecuencia, se produce el litigio que nos ocupa. Siendo esto

---

[1] Mediante la Orden Administrativa OAT-2023-131 se designa al Juez Joel A. Cruz Hiraldo en sustitución del Juez Félix R. Figueroa Cabán.

así, intentaremos sintetizarlo para la más cabal comprensión del asunto.

El señor Areizaga Soto y su pareja, la señora Pesquera López eran residentes del Condominio "The Green Villas", apartamento #28 en Dorado desde el año 2015. El inmueble era propiedad de una corporación organizada y registrada como Puerto Rico Al Trabajo, Inc., en la cual el agente residente y único accionista es el señor Areizaga Soto. Según los hechos de la demanda, mientras el apelante vivía en dicho condominio, no se exhibía un movimiento significativo entre el resto de los titulares, por lo que la villa parecía vacía o poco transcurrida.[2]

Para allá para diciembre del año 2019, se mudaron los doctores Saleem Josephs y su esposa Katayoun Yaraghi- Josephs (en adelante, los Josephs) con sus tres (3) hijos al apartamento #27 del mencionado complejo residencial, quedando así inmediatamente en el primer piso debajo del apelante. Surge de los hechos, que cuando Puerto Rico sufrió los efectos de la pandemia del COVID-19, a principios del año 2020, la comunidad residencial cambió su comportamiento significativamente por la obligación de permanecer en sus hogares según las órdenes ejecutivas y el aislamiento provocado por la pandemia.

Así las cosas, la familia Josephs y el señor Areizaga Soto comenzaron a tener discrepancias por la convivencia entre ellos, toda vez que, el apelante alegó que la familia Josephs no respetaba el distanciamiento social, el uso de las marcarillas y que mantenían una conducta violatoria en los espacios comunes.[3] Por su parte, los Josephs alegaron que el señor Areizaga Soto incurrió en un patrón de hostigamiento incesante y continuo. Asimismo, señalaron que los hijos menores de los Josephs eran regañados y fotografiados e

---

[2] Caso Núm. BY2021CV02085.
[3] *Id.* Entrada Núm. 3

intimidados por el apelante y su pareja sin su consentimiento, entre otros eventos. El 27 de mayo de 2021, los Josephs instaron una acción civil en contra del apelante y la señora Pesquera López. Solicitaron remedio por los daños y perjuicios sufridos, así como el cese y desista de la conducta desplegada por el señor Areizaga Soto y la señora Pesquera López, además como la condena de las costas, gastos y honorarios de abogados.

Al presente, dicha reclamación continúa pendiente de ser adjudicada, ante el Tribunal de Primera Instancia, Sala Superior de Bayamón, luego de que el Foro a *quo* emitiera una *Resolución*, donde determinó que no procedía dictar una sentencia sumaria en contra del señor Areizaga Soto por existir controversias de hechos materiales que impedían disponer sumariamente el pleito.[4] Dicha resolución hoy en día es final y firme.

Entre tanto, el 21 de febrero de 2022 el apelante cursó una reclamación a MAPFRE por tener una póliza de seguros expedida a su favor.[5] La póliza 1777208005684 emitida a favor del señor Areizaga Soto contiene los endosos #DL24010788PRS y 04.050 09/2000PRS. Según las alegaciones de la demanda del caso que nos ocupa, los referidos endosos "cubren la responsabilidad personal y lesiones personales, así como la definición de la póliza de 'lesión corporal', que cubren los daños emocionales, pues ello afecta la salud del cuerpo humano". El apelante solicitó a MAPFRE la cubierta de la póliza precitada y los gastos y honorarios incurridos por su defensa y representación legal. MAPFRE denegó dicha reclamación mediante carta el 6 de abril de 2022.[6] En la misiva, MAPFRE concluyó que la póliza no cobijaba los hechos alegados de

---

[4] *Resolución* emitida en el caso BY2021CV02085.
[5] Apéndice D del Recurso de Apelación, págs. 39-57.
[6] Apéndice E del Recurso de Apelación, págs. 46-47.

la demanda instada por los Josephs en su contra, según se desprendía del contrato suscrito entre el apelante y MAPFRE.

Inconforme con dicho proceder, el 27 de abril de 2022 el señor Areizaga Soto solicitó una reconsideración de la determinación emitida por MAPFRE.[7] Posteriormente, el 25 de mayo de 2022 presentó una segunda solicitud de reconsideración.[8] El 3 de junio de 2022 MAPFRE envió una segunda comunicación, donde se reiteró en la cubierta y exclusiones de la póliza. MAPFRE concluyó que, según las alegaciones de la demanda en contra del señor Areizaga Soto, estas no quedan cobijadas bajo "Lesiones corporales". A su vez, MAPFRE arguyó que no venía obligado a brindar representación legal, ni en la eventualidad sería responsable de la sentencia que recayera en contra del asegurado.[9]

Así las cosas, el 20 de julio de 2022, el señor Areizaga Soto por conducto de su representante legal envió una reclamación extrajudicial a MAPFRE.[10] En esencia, adujo que, por ser un contrato de adhesión entre las partes, debía interpretarse de forma beneficiosa hacia el asegurado. Arguyó que, según la jurisprudencia interpretativa del Tribunal Supremo de Puerto Rico, MAPFRE estaba obligado a proveerle cubierta y defensa al apelante. Advirtió que, de no recibir una respuesta estaría radicando la acción judicial correspondiente. Por no haber recibido respuesta en el tiempo dispuesto, el señor Areizaga Soto radicó la acción judicial que nos atañe.

Instado el pleito en contra de MAPFRE y luego de varios incidentes procesales, el 23 de diciembre de 2022 MAPFRE presentó una *Moción de Sentencia Sumaria*.[11] En resumen, MAPFRE sostuvo que las alegaciones comprendidas en contra del apelante consisten

---

[7] Apéndice F del Recurso de Apelación, págs. 48-49.
[8] Apéndice G del Recurso de Apelación, pág. 51.
[9] Apéndice H del Recurso de Apelación, págs. 52-53.
[10] Apéndice I del Recurso de Apelación, págs. 54-56.
[11] Apéndice II del Recurso de Apelación, págs. 63-149.

en actos no cubiertos por las cláusulas contenidas en la póliza, y que además las mismas están excluidas por ser consideradas violación a leyes u ordenanzas penales. Además, señaló que no existían controversias de hechos materiales en cuanto a que MAPFRE no tenía obligación para con el señor Areizaga Soto conforme a los términos claros de la póliza.

Por su parte, el 17 de enero de 2023 el señor Areizaga Soto presentó una *Oposición de Demandante a Moción de Sentencia Sumaria.*[12] Alegó que la póliza promulgada por MAPFRE contenía disposiciones confusas. Asimismo, que las definiciones provistas eran vagas y amplias por lo que debía interpretarse liberalmente a favor del asegurado. Relacionó lo que, a su entender eran múltiples contradicciones sobre lo que establecía la cubierta de la póliza y solicitó al Tribunal que lo que procedía era que se realizara determinaciones de hecho introvertidos a tenor con la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V. R. 36.4

Ulteriormente, el 6 de febrero de 2023 MAPFRE presentó un *Escrito de Réplica en Apoyo Adicional a Moción de Sentencia Sumaria.*[13] MAPFRE arguyó que el señor Areizaga Soto no incluyó ningún otro documento, más que una declaración jurada "self-serving" para respaldar los hechos contenidos en su oposición y que no derrotó los requisitos de la Regla 36.3 (b) de Procedimiento Civil, 36 LPRA Ap. V., R 36.3 (b).

A su vez, el 21 de febrero de 2023 el apelante presentó una *Dúplica a Réplica a MAPFRE.*[14] En su contención, argumentó que MAPFRE se limitó a citar jurisprudencia de otros estados que eran incompatibles con nuestro estado de derecho, así como la interpretación de las pólizas. Añadió que, a base de la negativa de

---

[12] Apéndice del Recurso de Apelación, págs. 213-227.
[13] Apéndice del Recurso de Apelación, págs. 231-238.
[14] Apéndice del Recurso de Apelación, págs. 239-244.

MAPFRE en dar cubierta por concluir que los actos eran intencionados por parte del señor Areizaga Soto, procedía celebrar un juicio plenario para dilucidar el elemento de intención.

El 15 de mayo de 2023 y notificado a las partes el 16 de mayo del mismo año, el foro primario dictó *Sentencia*.[15] En dicha sentencia, el foro apelado hizo una relación de las definiciones adscritas en la póliza. El Tribunal de Primera Instancia determinó que los alegados actos relatados en la demanda precitada no podían considerarse como involuntarios o imprevistos. Por lo que era menester concluir que las acciones del señor Areizaga Soto no estaban cubiertas por la póliza de seguros de MAPFRE y que esta no tenía responsabilidad de costear la representación legal del primer caso ni de la sentencia que en su día recayera. El Tribunal de Primera Instancia realizó las siguientes "***Determinaciones de Hechos***":[16]

1. MAPFRE expidió una Póliza Multilineal Personal a favor de Ángel Areizaga, #1777208005684 con fecha de efectividad de 31 de agosto de 2021 al 31 de agosto de 2022.

2. La Póliza incluye las siguientes cubiertas aseguradas: (a) seguro automóvil personal; (b) seguro de vivienda; (**c) responsabilidad civil personal**; (d) yate personal; (e) umbrella personal; (f) seguro de mascota; (g) seguro misceláneas.

3. En la declaración suplementaria de la cubierta de responsabilidad civil personal –identificada como la Sección III en la referida Póliza– se incluyeron como cubiertas la responsabilidad personal y los pagos médicos a otros.

4. **La cubierta de responsabilidad personal (Coverage L – Personal Liability) dispone que si se presenta una reclamación o demanda en contra del asegurado debido a "lesión corporal" (*bodily injury*) o "daños a la propiedad" (*property damage*) ocasionados por una "ocurrencia" (*occurrence*) a lo cual le aplica esa cubierta, MAPFRE, en lo pertinente:**

   **a. pagará hasta el límite de su responsabilidad por los daños que el asegurado esté obligado a responder.**
   **b. proveerá representación legal, a su costo, por un abogado escogido por MAPFRE, incluso cuando la demanda resulte infundada, falsa o fraudulenta**.

---

[15] Apéndice del Recurso de Apelación, págs. 247-262.
[16] Apéndice del Recurso de Apelación, págs. 247-262.

5. La cubierta de responsabilidad personal define "lesión corporal" (*bodily injury*) de la siguiente forma: *"bodily injury means bodily harm, sickness or disease, including required care, loss of services and death that results."*

6**. La cubierta de responsabilidad personal define "daños a la propiedad" (property damage) como: "*physical injury to, destruction of, or loss of use of tangible property*."**

7. **Por su parte, el concepto "ocurrencia" (*occurrence*) está definido como: "*[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:***

> **a. bodily injury; or**
> **b. property damage***."*

8. La cubierta de responsabilidad personal dispone como exclusiones que:

> 1. Coverage L-Personal Liability and Coverage M-Medical Payments to Others do not apply to "bodily injury" or "property damage":
> > a. Which is expected or intended by the "insured."

**9. Mediante el endoso 04.050 09/2000, anejado a la cubierta de responsabilidad personal, se enmendó la definición de "lesión corporal" para incluir también "lesión personal".**

10. **El concepto "lesión personal" se define como: "[u]na lesión resultante de una o más de las siguientes ofensas:**

> **a. Arresto, detención o encarcelamiento falsos o procesamiento malicioso;**
> **b. Libelo, calumnia o difamación de carácter; o**
> **c. Invasión de la privacidad, desahucio injusto o entrada ilegal**."

11. El endoso 04.050 09/2000 anejado a la cubierta de responsabilidad personal, dispone que: **La Sección II, Exclusiones, no se aplica a lesión persona**l. El seguro de lesión personal no se aplica a:

> 1. Responsabilidad asumida por el "asegurado" bajo cualquier contrato o acuerdo, excepto cualquier obligación de indemnización asumida por el "asegurado" bajo un contrato escrito relacionado directamente con la posesión, mantenimiento o uso de los predios;

> 2. **Lesión causada por una violación de una ley u ordenanza penal cometida por, o con el conocimiento o consentimiento de, un "asegurado**";

> 3. **Lesión sufrida por una persona como resultado de una ofensa relacionada directa o indirectamente con el empleo de esta persona por el "asegurado**";

> 4. Lesión que surja de o en conexión con un "negocio" en el que participe un "asegurado". Esta exclusión aplica, aunque no se limita, a un acto u omisión, independientemente de su naturaleza o circunstancia, que envuelva un

servicio u obligación prestada, prometida, debida o implícita a ser provista por causa de la naturaleza del "negocio";

5. Actividades cívicas o públicas realizadas por pago por un "asegurado"; o

6. Lesión a usted o a un "asegurado" dentro del significado de la parte a. o b. de "asegurado" según definido.

Todas las demás disposiciones de esta póliza aplican.

12. Además, la póliza dispone como exclusión de la cubierta de responsabilidad personal que: "No empece lo estipulado en cualquier Cláusula de esta póliza, este seguro no aplica a daños punitivos."

13. El 27 de mayo de 2021, se presentó una demanda sobre daños y perjuicios y angustias mentales en contra de Ángel Areizaga, María T. Pesquera López, la Sociedad Legal de Gananciales compuesta por ambos y Puerto Rico al Trabajo, Inc. en el caso *Saleem Josephs y Katayou Josephs et al. v. Angel Areizaga Soto y María T. Pesquera et al*, BY2021CV02085. (en adelante, la "*Demanda*").

14. Los demandantes son el matrimonio de Dr. Saleem Josephs y la Dra. Katayoun Yaraghi-Josephs (en adelante, el "Matrimonio Josephs").

15. Según la sección II de la *Demanda*, tanto Ángel Areizaga como el Matrimonio Josephs eran residentes de The Green Villas, Dorado, PR (en adelante, el "Condominio").

16. Según la sección II de la *Demanda*, la codemandada, Puerto Rico al Trabajo, Inc. es la titular registral del apartamento donde reside/ residía Ángel Areizaga.

17. Según las alegaciones del Matrimonio Josephs, Ángel Areizaga y los otros codemandados "se han encomendado a hostigar a los doctores Josephs y a sus hijos menores de edad con conductas aberrantes que demuestra un deterioro de salud mental significativo con el fin de que abandonen su hogar para que la propiedad nuevamente esté vacante."

18. Según las alegaciones del Matrimonio Josephs, Ángel Areizaga comenzó un patrón de hostigamiento hacia estos:

15. Cuando los doctores Josephs se mudaron al Condominio, el Sr. Areizaga Soto comenzó un patrón de hostigamiento incesante y continuo consistente en regañarlos por cualquier conducta que el Sr. Areizaga Soto entendiera era contraria a las reglas del Condominio, según él mismo se las inventaba y cambiaba arbitrariamente.

19. Entre otras alegaciones y ejemplos del alegado patrón de hostigamiento por parte de Ángel Areizaga están:

16. El Sr. Areizaga Soto comenzó a gritarle continuamente para intimidar a los doctores Josephs y a sus hijos menores por cosas insignificantes como dejar una bicicleta en la acera frente a la casa de ambos, estacionar un carrito de golf frente a la casa o en el estacionamiento de visitantes y dejar una raqueta de tenis frente a su casa.

17. Además de gritar e intimidar a los niños, el Sr. Areizaga Soto también hace que el guardia de seguridad del complejo toque a la puerta de los doctores Josephs continuamente para regañarlos por conductas insignificantes que en nada afectan la convivencia de la comunidad.

18. El Sr. Areizaga Soto y su esposa se asoman por su balcón a regañar a los niños de los doctores Josephs cuando juegan en su patio y a tomarles fotografías sin el consentimiento de los padres.

19. El Sr. Areizaga Soto toca a la puerta de los doctores Josephs continuamente para regañarlos por cosas como dejar un carrito de golf en el estacionamiento de visitantes o en la acera frente a la casa para poder conectarlo a la electricidad en lo que carga las baterías. Cuando hacen esto, el Sr. Areizaga Soto se queda velando a los doctores Josephs de manera intimidante, delante de la puerta de la casa de estos, hasta que los doctores Josephs cumplen con sus exigencias.

20. El Sr. Areizaga Soto en varias ocasiones se ha quedado parado mirando hacia la casa de los doctores Josephs por la puerta y por la ventana de forma intimidante con el único propósito de acecharlos, intimidarlos y hostigarlos.

21. El Sr. Areizaga Soto también les grita frecuentemente a las personas que visitan la casa de los doctores Josephs. Les ha gritado a amistades de los doctores Josephs por estacionar su carro frente a la acera de la casa en lo que acompañan a un niño que viene a visitar a los hijos menores de los doctores Josephs o le grita mientras se bajan a recoger a un niño en una gestión que apenas toma unos minutos.

22. Durante la pandemia, cuando los niños salían de su casa para ir a jugar tenis, donde estaban autorizados a estar sin mascarillas, o simplemente salían sin mascarilla porque se les olvidaba, el Sr. Areizaga Soto le gritaba y regañaba sobre el uso de mascarilla de forma hostil y amenazante.

20. De este modo, el Matrimonio Josephs alegó en la Demanda que:

24. Los doctores Josephs y sus hijos se han sentido intimidados, amenazados y hostigados por la conducta culposa y/o negligente de los demandados y esto les ha causado graves daños y angustias mentales.

25. Los doctores Josephs y sus hijos se han sentido que su honra ha sido atacada abusivamente por la conducta culposa y/o negligente de los demandados y esto les ha causado graves daños y angustias mentales.

21. Así las cosas, el Matrimonio Josephs adujo, además, que:

> 28. Los daños y perjuicios y angustias mentales, así como los ataques abusivos a su honra, sufridos por los doctores Josephs y sus hijos menores de edad son la consecuencia directa de la conducta culposa y/o negligente de los demandados.

22. A raíz de la *Demanda* antes descrita, Ángel Areizaga le envió un correo electrónico al productor de la póliza expedida por MAPFRE, refiriendo la demanda presentada en su contra, y reclamando cubierta en virtud de la mencionada póliza.

23. A su vez, esta reclamación, junto con copia de la demanda y de la reconvención presentada por Ángel Areizaga, se remitió a MAPFRE quien asignó un ajustador para la evaluación correspondiente.

24. El 6 de abril de 2022, MAPFRE envió una misiva a Ángel Areizaga informándole que las alegaciones de la demanda no están cubiertas por la póliza.

25. El 27 de abril de 2022 y el 25 de mayo de 2022, Ángel Areizaga remitió una subsiguiente misiva y correo electrónico informando su desacuerdo con la determinación de MAPFRE y, por consiguiente, solicitando reconsideración.
(Énfasis suplido).

Así pues, el foro apelado declaró *Ha Lugar* la *Sentencia Sumaria* presentada por MAPFRE y desestimó con perjuicio la demanda presentada por los aquí apelantes.

Inconforme con el dictamen emitido del Tribunal de Primera Instancia, la parte peticionaria-apelante presentó el auto de *certiorari* ante nos. Sin embargo, por haber solicitado una revisión de una sentencia que desestimó el pleito, este Tribunal lo acogió como un recurso de apelación.

En el mismo le imputó al foro apelado los siguientes señalamientos de error:

> I. LA SENTENCIA DEL TPI ES CONTRARIA A LA INTERPRETACIÓN DEL TRIBUNAL SUPREMO EN CUANTO A LAS CLÁUSULAS DEL CONTRATO DE SEGURO COMO CONTRATO DE ADHESIÓN, CUANDO, COMO EN ESTE CASO, LAS DEFINICIONES DE LO QUE CONSTITUYE DAÑO CORPORAL, ASI COMO OCURRENCIA Y/O ACCIDENTE, SON AMBIGUAS, POR LO QUE PROCEDÍA DAR CUBIERTA AL SR. AREIZAGA, O AL MENOS DARLE REPRESENTACIÓN LEGAL.

II. EN VIOLACIÓN A LA REGLA 36 DE PROCEDIMIENTO CIVIL, EL TPI OMITIÓ DISCUTIR Y DETERMINAR LOS HECHOS INDISPUTADOS QUE SE RELACIONARON EN LA OPOSICIÓN DEL SR. AREIZAGA, Y QUE REQUERÍAN SER DILUCIDADOS EN JUICIO O EN VISTA EVIDENCIARIA.

Examinado el recurso en su totalidad y con la comparecencia ambas partes, procedemos a establecer el derecho aplicable y resolver.

**-II-**

***-A-***

La sentencia sumaria es un mecanismo procesal que tiene como propósito la solución, justa, rápida y económica de los litigios civiles que no contengan controversias genuinas de hechos materiales y que, por lo tanto, no ameritan la celebración de un juicio en su fondo. *Segarra Rivera v. Int'l Shipping et al.*, 208 DPR 964, 979 (2022). La Regla 36.1 de Procedimiento Civil establece que las partes podrán presentar una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación solicitada. 36 LPRA Ap. V. R. 36.1. La sentencia sumaria es una excepción al juicio mediante testimonios vivos frente al juzgador de los hechos. *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013). La parte que solicita la sentencia sumaria tiene la responsabilidad de demostrar de manera clara que el promovido no puede prevalecer mediante ningún supuesto de hechos y que el tribunal cuenta con la verdad sobre todos los hechos necesarios para resolver la controversia ante su consideración. *Id.*

Por su parte, el Tribunal tiene discreción para conceder o no la sentencia sumaria, ya que el mal uso de esta puede despojar a un

litigante de su día en corte, lo cual coartaría su debido proceso de ley. *Echandi Otero v. Stewart Title,* 174 DPR 355, 369 (2008); *Roig Com. Bank v. Rosario Cirino,* 126 DPR 613, 617 (1990). Es por lo anterior, que no es aconsejable que se utilice el mecanismo de sentencia sumaria cuando hay elementos subjetivos, de intención, propósitos mentales o negligencia, o cuando el factor de credibilidad sea esencial para dilucidar la controversia que deban ser evaluados por el juzgador. *Segarra Rivera v. Int'l Shipping et al.*, *supra,* pág. 980. No obstante, el Tribunal puede utilizar el mecanismo de sentencia sumaria, aun cuando hay elementos subjetivos, si la evidencia que será considerada en la solicitud surge que no existe controversia en cuanto a los hechos materiales. *SLG Zapata-Rivera v. J.F. Montalvo, supra,* pág. 442-443.

Ahora bien, antes de utilizar el mecanismo de sentencia sumaria, el Tribunal debe evaluar lo siguiente: (1) analizará los documentos que acompañan la moción solicitando la sentencia sumaria y los documentos incluidos con la moción en oposición y aquellos que obren en el expediente del tribunal; (2) determinará si el oponente controvirtió algún hecho material o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos. *Mgmt. Adm. Servs. Corp. v. ELA,* 152 DPR 599, 611 (2000).

En síntesis, el Tribunal de Primera Instancia no podrá dictar sentencia sumaria cuando: "(1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la demanda que no ha sido refutadas; (3) surja de los propios documentos que se acompañan con la moción una controversia real sobre hecho material y esencial, o (4) como cuestión de derecho no proceda". *SLG Fernández-Bernal v. RAD-MAN,* 208 DPR 310, 335 (2021).

Asimismo, si la otra parte desea derrotar una moción de sentencia sumaria, deberá presentar declaraciones juradas y documentos que pongan en controversia los hechos presentados por el promovente. *PFZ Props, Inc. v Gen. Acc Ins. Co.*, 136 DPR 881, 912-913 (1994). No obstante, el solo hecho de no presentar evidencia que controvierta la presentada por el promovente, no implica necesariamente que procede la sentencia sumaria. *Id.* Los jueces no están constreñidos por los hechos o documentos evidenciarios que se aduzcan en la solicitud de sentencia sumaria, sino que tienen el deber de considerar todos los documentos en autos, incluso aquella que no haya formado parte de la solicitud, sin dirimir cuestiones de credibilidad. *Vera v. Dr. Bravo*, 161 DPR 308, 333 (2004).

En cuanto al estándar de revisión aplicable al Tribunal de Apelaciones al momento de revisar la determinación del foro primario de conceder o denegar la sentencia sumaria, el foro intermedio apelativo solo puede: (1) considerar los documentos que se presentaron ante el foro primario cual implica que, en apelación los litigantes no pueden añadir prueba que no fue presentada oportunamente ante el foro primario, ni esbozar nuevas teorías, (2) determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y (3) determinar si el derecho se aplicó de forma correcta. *Segarra Rivera v. Int'l Shipping et al.*, *supra*, pág. 981.

Por utilizar los mismos criterios de evaluación, los foros apelativos se encuentran en la misma posición que el tribunal de instancia. *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 116 (2015). Ahora bien, el Tribunal Supremo estableció que el estándar a seguir para revisar la denegatoria o concesión de una moción de sentencia sumaria es el siguiente:

(1) que el Tribunal de Apelaciones se encuentre en la misma posición del Tribunal de Primera Instancia al

momento de revisar solicitudes de sentencia sumaria, y que esta revisión sea *de novo*;

(2) que el Tribunal de Apelaciones revise que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en las Reglas de Procedimiento Civil;

(3) que el Tribunal de Apelaciones revise si en realidad existen hechos materiales en controversia y si existen debe exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y

(4) si los hechos materiales realmente son incontrovertidos, el foro apelativo intermedio procederá entonces a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho en la controversia. *Segarra Rivera v. Int'l Shipping et al.*, *supra*, pág. 982.

### -B-

Sabido es que, en nuestra jurisdicción la industria de seguros está revestida de un gran interés público debido a su importancia, complejidad y efecto en la economía y la sociedad. *WMM, PFM et al. v. Colegio et al.,* 211 DPR 871, 884 (2023); *Jiménez López et al. v. SIMED*, 180 DPR 1, 8 (2010). El Código de Seguros de Puerto Rico (en adelante, Código de Seguros), surge como respuesta a la necesidad de que "los asegurados estén mejor protegidos, [y] que la industria pueda desarrollarse con mayor facilidad". Nuestro Código de Seguros es de carácter anglosajón, y fue inspirado en los ante proyectos de los estados de Washington, Kentucky, Arizona y Michigan. *Monteagudo Pérez v. ELA* 172 DPR 12, 19 (2007).

El Código de Seguros ha sido objeto de múltiples enmiendas, en aras de robustecerse con las disposiciones estatales y federales sobre la materia. Sin embargo, "[n]o hay duda alguna de que las pólizas que se ofrecen y venden dentro de la industria de seguros en Puerto Rico son, de ordinario, las pólizas modelos que venden las compañías de seguros estadounidenses". (citas omitidas). El Tribunal Supremo de Puerto Rico ha sido enfático en que, ese Foro "no ha descartado que al resolver aquellos pleitos de seguros en que

se requiere interpretar las cláusulas de la póliza, se utilicen las normas del derecho angloamericano *sin descartar las normas del derecho civil*". *Domínguez v. GA Life*, 157 DPR 690, 701 (2002) (bastardilla en el original). Dicho lo anterior, la interpretación de las decisiones provenientes de los distintos estados en la materia de seguros es altamente persuasiva para nuestros tribunales. Sin embargo, de ninguna manera, resulta obligatoria.

La Ley Núm. 77-1957, también conocida como "El Código de Seguros de Puerto Rico", según enmendada, 26 LPRA sec. 101 *et seq* define "*Seguro*" como: "Es el contrato mediante el cual una persona se obliga a indemnizar a otra o a pagarle o a proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo". Artículo 1.020, 26 LPRA sec. 102. *San Luis Center Apts. et al. v. Triple-S,* 208 DPR 824, 831 (2022). Como norma general, los contratos de seguro tienen como característica esencial la obligación de indemnizar, esto es, de resarcir un daño o perjuicio. *OCS v. CODEPOLA*, 202 DPR 842, 859 (2019). El propósito de todo contrato de seguros es la indemnización y protección en caso de producirse el suceso incierto previsto en este. 26 LPRA sec. 1125; *Echandi Otero v. Stewart Title, supra*, pág. 370.

Al momento de interpretar las cláusulas de un contrato de seguro hay que recordar que estos contratos constituyen ley entre las partes, siempre y cuando cumplan con los requisitos de todos los contratos, a saber, que tengan objeto, consentimiento y causa, y que no sean contrarios a la ley y al orden público. *Coop. Ahorro y Cred. Oriental v. SLG*, 158 DPR 714, 723 (2003). El Tribunal Supremo de Puerto Rico ha resuelto que un contrato de seguros es un contrato de adhesión, donde una sola de las partes dicta las condiciones del contrato, las cuales ha de aceptar la otra parte contratante. *Feliciano Aguayo v. MAPFRE,* 207 DPR 138, 151 (2021). Es por ello que, el contrato de seguros debe interpretarse

liberalmente a favor del asegurado para así sostener la cubierta por vía de una interpretación razonable. *SLG Francis-Acevedo v. SIMED,* 176 DPR 372, 386 (2009).

Esto necesariamente obedece a que, como los términos de las pólizas de seguro no son el producto de la negociación entre las partes, sino que son prefijados por el asegurador sin que el asegurado tenga la facultad de variarlos, el asegurador "tiene la obligación de hacer clara su intención; en otras palabras, viene obligado a establecer en la póliza, de manera diáfana, los riesgos por los que viene obligado a responder". *SLG Francis-Acevedo v. SIMED, supra,* pág. 386. En atención a lo anterior, el más alto foro de Puerto Rico ha reconocido que los términos de las pólizas de seguro "deben ser generalmente atendidos en su más corriente y usual significado, sin atender demasiado al rigor gramatical, sino al uso general y popular de las voces. *Id.* pág. 387.

Por lo tanto, ante la ausencia de ambigüedad en las cláusulas del contrato, éstas son obligatorias y su contenido constituye la ley entre las partes. *WMM, PFM et al. v. Colegio et al., supra,* pág. 886. Ciertamente**, "el asegurado tiene derecho a confiar en la cubierta de la póliza que se le ofrece leyendo las cláusulas del contrato a la luz del sentido popular de las palabras".** *Serrano Picón v. Multinational Life Ins.,* 212 DPR 981 (2023).

Es decir, **los contratos de seguro tienen como característica esencial la obligación de indemnizar***. OCS v. CODEPOLA,* supra*,* pág. 859. **A su vez, los contratos de seguro son de extrema buena fe**. Esto es, que se requiere un extremo grado de buena fe en las negociaciones precedentes a la perfección o consumación del contrato. (Citas omitidas). Armonizando lo anterior, "la buena fe es un precepto general de toda actividad jurídica y, como tal, se extiende a la totalidad de nuestro

ordenamiento". *Feliciano Aguayo v. MAPFRE, supra,* pág. 140. (Énfasis suplido).

## -C-

Existen distintos tipos de seguro, por lo que podemos distinguir entre aquellos que van dirigidos a resguardar aspectos personales o pérdidas a la propiedad del propio asegurado, a diferencia de los seguros que le ofrecen protección frente a reclamaciones instadas en su contra por terceros que han sufrido daños por su causa. *Maderas Tratadas v. Sun Alliance et al.*, 185 DPR 880, 900 (2012). **Esta última modalidad, conocida como seguro de responsabilidad civil o pública, tiene como fin primordial garantizar al asegurado contra la responsabilidad civil en que pueda incurrir ante terceros por actos de los que sea legalmente responsable**. En otras palabras, "el asegurador se compromete, conforme a las condiciones estipuladas en el contrato, a indemnizar a un tercero por aquellos daños y perjuicios que le ha causado el asegurado". *Maderas Tratadas v. Sun Alliance et al., supra,* pág. 900. (Énfasis suplido).

Es preciso recordar que "**un seguro no responde por toda gestión imaginable del asegurado que pueda causar daño a terceros**". (Énfasis suplido en el original). *Maderas Tratadas v. Sun Alliance et al., supra*, pág. 900, citando a *Meléndez Piñero v. Levitt & Sons of P.R.,* 129 DPR 521 (1991). Cónsono con lo antes expuesto, '[l]a cubierta se circunscribe a determinadas actividades específicamente delimitadas en la póliza juntamente con las exclusiones allí dispuestas, donde se exceptúan ciertas actividades por las que no viene obligado a indemnizar'. *Íd.,* pág. 900. Por consiguiente, para precisar el alcance de la protección que ofrece una póliza, resulta necesario evaluar si el contrato contiene cláusulas de exclusión que exceptúen determinados eventos, riesgos o peligros de la cubierta". *WMM, PFM et al. v. Colegio et al., supra,*

pág. 889; *Rivera Matos et al.* v. *Triple-S et al.,* 204 DPR 1010, 1021 (2020). (Énfasis suplido).

Ahora bien, el principio de hermenéutica rige la interpretación que impone el Código de Seguros. Esta norma no tiene el efecto de obligar a los tribunales a interpretar a favor del asegurado una cláusula que claramente le da la razón al asegurador cuando su significado y alcance sea claro y libre de ambigüedad. *Serrano Picón v. Multinational Ins., supra; SLG Francis-Acevedo v. SIMED, supra,* pág. 387-388*; Echandi Otero v. Steward Title, supra,* pág. 370. En cuestión de hermenéutica, el Código de Seguros dispone que los contratos de seguro se interpretan globalmente, a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido o modificado por aditamento, endoso o solicitud adherida a la póliza y que forme parte de esta. *Natal Cruz v. Santiago Negrón et al.,* 188 DPR 564, 576-577 (2013).

A su vez, si los términos del contrato de seguro son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Sin embargo, al reconocer que el contrato de seguro lo redacta en su totalidad el asegurador, las cláusulas oscuras o ambiguas se interpretarán a favor del asegurado. Por el contrario, en ausencia de ambigüedad, las cláusulas del contrato son obligatorias. *Natal Cruz v. Santiago Negrón et al.,* supra, págs. 565-566.

Por otro lado, las cláusulas de exclusión limitan la cubierta de una póliza de seguro al exceptuar determinados eventos, riesgos o peligros. *Viruet et al. v. SLG Casiano Reyes*, 194 DPR 271, 279 (2015). Al determinar cuáles son los riesgos cubiertos por una póliza de seguro es necesario considerar si en el contrato figura una cláusula de exclusión. Estas cláusulas tienen el propósito de limitar la cubierta establecida en el acuerdo principal y disponen que el asegurador no responderá por determinados eventos, riesgos

o peligros. Por dicha razón, el máximo foro de Puerto Rico ha resuelto que **"las exclusiones se han de *interpretar restrictivamente* a favor del asegurado, para así cumplir con el propósito de todo seguro de ofrecer la mayor protección a la persona asegurada"**. *Rivera Matos et al. v. Triple-S et al.,* supra, pág. 1021; *Echandi Otero v. Stewart Title, supra,* pág. 370-371. (Énfasis suplido); (bastardillas en el original).

No obstante, y a tenor con la norma general, si una cláusula de exclusión aplica claramente a determinada situación, la aseguradora no está obligada a responder por los riesgos expresamente excluidos. *Echandi Otero v. Stewart Title, supra,* pág. pág. 371. Finalmente, debemos destacar que, **"corresponde al asegurado el peso de establecer que su reclamación está comprendida dentro de las disposiciones del contrato de seguro, mientras que es la aseguradora quien tiene que evidenciar que aplica alguna exclusión"**. *Rivera Matos et al. v. Triple-S et al.,* supra, pág. 1022. (Énfasis suplido).

Sabido es que, una práctica usual es que "los contratos de seguros incluyan cláusulas para establecer la obligación de la compañía aseguradora de proveer representación legal al asegurado ante reclamos de daños físicos o a la propiedad, producto de siniestros cubiertos por la póliza. **Debido a que el propósito de una póliza de seguro es brindar protección al asegurado, el deber de representarlos legalmente es parte esencial de la cubierta que se contrata con la compañía aseguradora"**. *PFZ Props., Inc. v. Gen. Acc. Ins. Co.,* supra, pág. 893, citando a *Pagán Caraballo v. Silva, Ortiz,* 122 DPR 105 (1988). (Énfasis suplido). Así pues, necesariamente "[l]a obligación de defender (*duty to defend*) ha sido definida por la jurisprudencia del *common law* estadounidense como el deber que tiene el contratista de proveer o pagar por los servicios de representación legal al principal en todas las reclamaciones

cubiertas por el acuerdo de relevo de responsabilidad o de indemnización pactado entre ambos. **Esta obligación es independiente al deber de indemnizar y no está sujeta a los méritos de la reclamación o demanda subyacente**". *Burgos López v. Condado Plaza*, 193 DPR 1, 11 (2015) citando a *Crawford v. Weather Shield Mfg., Inc.*, 187 P.3d 424 (Cal. 2008). El Tribunal Supremo de Puerto Rico ha establecido que, "queda claro que en el *common law* el deber de defender no depende del resultado del litigio, ni de que en efecto se determine que el contratista debe indemnizar al principal**. Por el contrario, la obligación de defender se activa al momento en que el principal le solicita al contratista que le defienda de una reclamación en donde se alegan actos cubiertos por el acuerdo** ("tender of defense")". *Burgos López v. Condado Plaza, supra*, pág. 11, citando a *Crawford v. Weather Shield Mfg., Inc., supra*, pág. 434; *UDC-Universal Development v. CH2M Hill*, 103 Cal. Rptr.3d 684, 693 (Cal. Ct. App. 2010). (Énfasis suplido); (bastardillas en el original).

Por otro lado, sobre las cláusulas para establecer la obligación de la compañía aseguradora de proveer representación legal al asegurado, surge cuando de una interpretación liberal de las alegaciones existe una posibilidad de que el asegurado esté protegido por la póliza expedida. **El deber de proveer representación existe independientemente del resultado del caso y de cuál sea la adjudicación final**. *Echandi Otero v. Steward Title, supra*, pág. 372; *Aguilar v. Universal*, 162 DPR 788, 794 (2004) (Resolución); *Vega v. Pepsi Cola Bot. Co.*, 118 DPR 661, 666 (1987). **Cualquier duda sobre si existe el deber de asumir la defensa en un caso en particular tendrá que ser resuelta a favor del asegurado**. *Rivera Matos et al. v. Triple-S et al.*, supra, pág.1021. **Este tipo de obligación subsiste, aunque la acción sea infundada, falsa o fraudulenta**. *PFZ Props. Inc., v. Gen Acc. Ins. Co.*,

*supra*, pág. 895; *Martínez Pérez v. UCB,* 143 DPR 554, 562 (1998). (Énfasis suplido).

Es por ello, que **"[s]i la demanda contiene alegaciones que están cubiertas por la póliza, así como otras que no lo están o podrían no estarlo, la compañía de seguros tiene el deber de asumir la defensa del asegurado aun sobre aquellas reclamaciones que no estén cubiertas por la póliza**. **El hecho de que la demanda contenga alegaciones ambiguas o incompatibles no releva a la compañía de su deber de defender, ya que el deber de los aseguradores de defender contra una reclamación que cae bajo la cubierta de la póliza no cesa por el hecho de que las alegaciones del demandante no sean perfectas. Esto es, la obligación del asegurador no consiste en simplemente defender en aquellos casos en que se hagan declaraciones perfectas, cubre también aquellos casos en que se pueda razonablemente inferir de las alegaciones la responsabilidad del asegurado y ni la ambigüedad, inconsistencia o duplicidad en la demanda o declaración de los demandantes puede justificar el que el asegurador no cumpla con su obligación de defender**. *Pagán Caraballo v. Silva, Ortiz, supra,* pág. 112, c*itando* a 14 Couch on Insurance 2d (rev. Ed). Sec. 51:49 (1982); (Énfasis suplido).

Desde tiempos inmemoriales, el Tribunal Supremo de Puerto Rico ha recalcado que, en materia de seguros, en particular sobre el deber de representación legal, "**no es suficiente, para relevar a la aseguradora de su responsabilidad de defender al asegurado, que el daño reclamado no esté cubierto por la póliza**. **Aunque su deber es defender aquellas acciones que caigan dentro de los términos de la póliza, tal deber se mide, en primer término, por las alegaciones del demandante y si dichas alegaciones establecen hechos que colocan el daño dentro de la cubierta de la póliza, el asegurador tiene que defender irrespectivamente de**

**la responsabilidad que en última instancia tenga el asegurado para con el demandante**". *Fernández v. Royal Indemnity Co.* 87 DPR 859, 863 (1963). (Énfasis suplido).

Para decidir nuestra controversia solo tenemos que examinar las alegaciones de la Demanda contra el asegurado y las cláusulas de la póliza al decidir sobre la obligación de la aseguradora de defender y proveer defensa legal al asegurado. Basado en el Principio del Common Law, conocido como "la Regla de las ocho esquinas" ("Eight Corners Rule"), el deber de defender está determinado por los reclamos alegados en la petición y la cobertura brindada en la póliza; Si una petición no alega hechos dentro del alcance de la cobertura, una aseguradora no está legalmente obligada a defender una demanda contra su asegurado. *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650 (Tex. 2009). Este principio se conoce comúnmente como la regla de los ocho rincones o "eight corners rule" porque la decisión se alcanzará comparando las "cuatro (4) esquinas" del reclamo subyacente con las "cuatro (4) esquinas" de la póliza para determinar si las alegaciones del reclamo caen bajo la cubierta de la póliza. *AES Corp. v. Steadfast Ins. Co.*, 283 Va. 609, 725 S.E.2d 532 (2012). La regla de las ocho esquinas no es una enmienda judicial a los acuerdos de las partes. Más bien, su propósito es "efectuar esos acuerdos, hacerlos cumplir de manera consistente y predecible para que las partes puedan redactar sus acuerdos sabiendo cómo los interpretarán los tribunales". *Richards v. State Farm Lloyds*, 597 S.W.3d 492, 499 (Tex. 2020).

La obligación de la aseguradora de defender es más amplia que la obligación de pagar y surge siempre que el reclamo alegue algunos hechos y circunstancias que si probados pudieran caer dentro del riesgo cubierto por la póliza. *AES Corp. v. Steadfast Ins. Co.*, *supra*, pág. 725; *Virginia Elec. & Power Co. v. Northbrook Prop. & Cas. Ins. Co.*, 252 Va. 265, 268–69, 475 S.E.2d 264, 265–66

(1996); Copp, 279 Va. at 682, 692 S.E.2d at 224. Por otro lado, si claramente surge que el asegurador, basado en las alegaciones, obligación de defender, menos tendría que proveer cubierta. *AES Corp. v. Steadfast Ins.* Co., *supra,* pág. 725; *Travelers Indem. Co.*, 219 Va. at 46, 245 S.E.2d at 249. Las aseguradoras están obligadas a defender sus asegurados si hay "posibilidad que la reclamación de responsabilidad caiga dentro de la cubierta de la póliza." *In re Acushnet River & New Bedford Harbor: Proceedings Re Alleged PCB Pollution,* 725 F.Supp. 1264, 1266 (1989).

### -III-

El apelante acude ante este Tribunal solicitando que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia de San Juan, por no estar conforme con la determinación del foro primario. La controversia ante nos, se reduce a determinar si los alegados actos en el pleito BY2021CV02085 y por los cuales se le reclama al apelante, en daños y perjuicios constituyen conducta excluida de su póliza de responsabilidad personal.

De una lectura serena de la cubierta que provee la póliza, la Cubierta de Responsabilidad, intitulada **L- Responsabilidad Personal** lee como sigue:

> Si se presenta una reclamación o se entabla una demanda contra un "asegurado" debido a "lesión corporal" o "daño a la propiedad" ocasionado por una "ocurrencia" a la cual aplica esta cubierta, nosotros:
>
> 1. Pagaremos hasta nuestro límite de responsabilidad por los daños por los que el "asegurado" sea legalmente responsable. Daños que incluye el interés presentencia que se conceda contra el "asegurado".
>
> 2. **Proveeremos, a nuestro costo la defensa mediante abogado de nuestra elección, aunque la demanda sea infundada, falsa o fraudulenta.** Podremos investigar y liquidar cualquier reclamación o demanda que consideremos apropiada. Nuestra obligación de liquidar o defender termina cuando la cantidad pagada por los daños resultantes de la ocurrencia iguala nuestro

límite de responsabilidad.[17] (Énfasis suplido).

Además, la referida cubierta tiene un endoso adicional, 04.050/09/2000 que dispone de la siguiente forma:

El concepto "lesión personal" se define como: "[u]na lesión resultante de una o más de las siguientes ofensas:

a. Arresto, detención o encarcelamiento falsos o procesamiento malicioso;
b. Libelo, calumnia o difamación de carácter; o
c. Invasión de la privacidad, desahucio injusto o entrada ilegal".[18]

Por su parte, el concepto "**ocurrencia**" (*occurrence*) está definido como: ***"[a]n accident**, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:*
*a. bodily injury; or*
*b. property damage."*
(bastardilla en original); (Énfasis suplido).

Dentro de la Sección II, Exclusiones, se detalla lo siguiente:

**La Sección II, Exclusiones, no se aplica a lesión personal.** El seguro de lesión personal no se aplica a:
1.Responsabilidad asumida por el "asegurado" bajo cualquier contrato o acuerdo, excepto cualquier obligación de indemnización asumida por el "asegurado" bajo un contrato escrito relacionado directamente con la posesión, mantenimiento o uso de los predios;
**2. Lesión causada por una violación de una ley u ordenanza penal cometida por, o con el conocimiento o consentimiento de, un "asegurado"**;
**3. Lesión sufrida por una persona como resultado de una ofensa relacionada directa o indirectamente con el empleo de esta persona por el "asegurado"**;[19]

No obstante lo anterior, cuando se evalúa si la conducta es intencional, deliberada, y como tal llega a considerarse un accidente u ocurrencia, en muchas ocasiones se reduce a determinar si ese accidente u ocurrencia debe ser visto desde la perspectiva de la víctima o del asegurado. Couch on Ins. (rev. 9d) Sec. 126:25-126:40

---

[17] Apéndice 1 del Recurso de Apelación, pág. 19.
[18] Apéndice del Recurso de Apelación, pág. 132
[19] *Íd.*, pág. 132.

(2024). La postura adaptada en los diferentes tribunales del sistema anglosajón se ha atemperado de acuerdo a las modificaciones que ha sufrido la industria de los seguros. De ahí, la definición de 'ocurrencia' precitada. Dado a que anteriormente se le había dado un tratamiento igual a los términos 'ocurrencia' y 'accidente' 'se refieren a un incidente que fue inesperado desde el punto de vista del asegurado". (citas omitidas). El Tribunal Supremo de Virginia sostuvo que por 'accidente' se entiende comúnmente "*un evento que crea un efecto que no es la consecuencia natural o probable de los medios empleados y no está previsto, diseñado o anticipado razonablemente*". *Lynchburg Foundry Co. contra Irvin,* 178 Va. 265, 271, 16SE. 2d 646, 648 (1941). (Bastardillas en el original). Una lesión accidental es aquella que "ocurre por casualidad o inesperadamente; no teniendo lugar según el curso habitual de las cosas, o es casual o fortuito". *AES Corp. v. Steadfast Ins. Co.,* 283 Va. 609, 617–18, 725 S.E.2d 532, 536 (2012); *Utica Mut. Ins. Co. v. Travelers Indem.* Co., 223 Va. 145, 147, 286 S.E.2d 225, 226 (1982). Ahora bien, si el resultado es la consecuencia natural o probable de actos intencionales, entonces no se constituye un "accidente" cubierto por la póliza de responsabilidad personal.

MAPFRE alega que los actos empleados por el apelante en las discrepancias entre vecinos son intencionales, incluso añade que "activan la exclusión de 'lesión causada por una violación de una ley u ordenanza penal".[20] La parte apelada sostiene que "el acecho, el hostigamiento, intimidación y ataques abusivos a la honra no están cubiertos por la póliza expedida".[21] No vemos como podría prevenirse, el que el llamarle la atención a sus vecinos por violaciones a las reglas de seguridad y salubridad, incluso a las reglas de convivencia en la comunidad podría generar

---

[20] Recurso de Oposición al Recurso de Apelación, pág. 2
[21] *Íd.,* pág. 6

responsabilidad de parte del apelante. MAPFRE sostiene que, los actos del señor Areizaga Soto dirigidos el exigir el cumplimiento con las normas es un acto claramente intencional e ilegal para claramente eludir el pago de la defensa legal dispuesta en la póliza intitulada L-Responsabilidad Personal. Pues como señalamos previamente, que si el resultado natural o probable, es la consecuencia del acto intencional del asegurado, entonces, no es un accidente. *AES Corp. v. Steadfast Ins. Co., supra,* pág. 618, citando a *Resource Bankshares Corp. v.St. Paul Mercury Ins. Co.*, 407 F.3d 631, 637 (4th Cir.2005).

Para denegar una cubierta por actos intencionales, es necesario auscultar más allá de una posibilidad, tiene que alegarse que el asegurado subjetivamente, a propósito, o anticipando el resultado de sus actos intencionales u objetivamente, era el resultado natural y probable a consecuencia de sus actos intencionales. Nótese que las alegaciones de la demanda de los Josephs en contra del apelante, ni siquiera generaron una intervención de la policía, tampoco una reclamación bajo la Ley de controversias y Estados Provisionales de Derecho (Ley Núm. 140-1974), ni al amparo de la Ley Contra el Acecho (Ley Núm. 284-1999), mucho menos al palio del Código Penal, 33 LPRA sec. 5331. Las reclamaciones en contra del apelante son meras alegaciones.

De una lectura integral de la póliza, no podemos concluir que la mera alegación de un "acto intencional" que pueda generar responsabilidad queda excluido de la aplicación de la cubierta, ni que esto prive al asegurado de representación legal. Desde el punto de vista para el apelante, es un accidente, puesto que de ninguna manera era previsible que pedirles a sus vecinos que cumplieran con las reglas de la comunidad, aun de la manera más desagradable que los Josephs alegan, generaría una reclamación en daños.

Adviértase además que, el asegurado ni siquiera ha reconocido ni ha sido responsabilizado por dichos actos según alegados, actos de acecho e intimidación. Incluso de dicha reclamación también se generó una reconvención. Afirmar la postura de MAPFRE, sería decir que las meras alegaciones de un tercero, sin confirmar, son suficientes para intervenir en un contrato entre dos. La obligación de prestar representación legal es lo mínimo que la compañía aseguradora debería proveer, aun cuando se reserve el derecho de cubierta al resultado de la acción entre las partes.

Nótese que, desde la perspectiva del asegurado los actos no fueron cometidos con la intención de acechar u hostigar sino de corregir. De manera que, como mínimo merece de su asegurador una representación legal si hay una acción en su contra. El pago de los daños, si alguno, se pueden condicionar, en su día a que se pruebe que los actos cometidos fueron intencionales, de forma que MAPFRE sea capaz entonces de eludir su obligación de cubrir los daños. Los actos de los asegurados no son actos intencionales de su faz. Consentir a lo que aquí se pide sería abrir la puerta a reclamaciones por solicitar correcciones de actos incorrectos. Concluir eso es una interpretación a favor del asegurador y esto daría al traste con la jurisprudencia interpretativa del Tribunal Supremo de Puerto Rico.

Así pues, el término "causado por un accidente" según utilizado en las pólizas de responsabilidad personal se satisface con que, "**el asegurado no haya querido intencionalmente causar el daño resultante de sus actos aun cuando la acción por sí misma era intencional y así resultó**." *Fidelity and Cas. Co. of New York v. Wrather,* 1983 652 S.W.2d 245, 249. La acción intencional capaz de justificar la exclusión de la póliza es aquella que produce un daño que resulta de actos intencionales deliberadamente llevados a cabo

por el asegurado sabiendo que dichos actos eran erróneos, ilegales y con toda la intención de causar el daño. *Fidelity and Cas. Co. of New York v. Wrather, supra*, pág. 249. (Énfasis suplido). De las alegaciones plasmadas en la demanda contra el señor Areizaga Soto, no creemos que las actuaciones hayan sido ejecutadas en aras de acechar o intimar a los Josephs. El acecho que alegan contra el apelante no está probado como producto de una conducta intencional, más allá de ser producto de los propios actos negligentes de los Josephs durante el período de convivencia entre vecinos. Dicha conclusión, debió orientar a MAPFRE como mínimo, a proveerle representación legal a su asegurado.

Una interpretación tan extensiva como la que pretende MAPFRE, dejaría sin cubierta y obligación de representación legal a cualquier reclamación que se inste bajo una póliza como la de marras, donde la aseguradora concluye arbitrariamente que todo acto negligente generador de un daño puede tener un elemento de intención. El asunto dispositivo para determinar si un daño accidental ocurrió no es si la acción del asegurado fue intencional, sino que el daño se podía anticipar como una consecuencia natural o probable del acto intencional del asegurado. *AES Corp. v. Steadfast Ins. Co., supra*, pág. 618; *Fidelity & Guar. Ins.,* 238 Va. at 462, 384 S.E.2d at 615.

Según reseñamos previamente, los términos utilizados en la póliza deben interpretarse cuidadosamente y de manera global. Ahora bien, esto necesariamente implica un análisis integral de las actuaciones y omisiones, así como de las exclusiones consignadas en la póliza. A su vez, esta interpretación basada en la hermenéutica aplicable y la jurisprudencia interpretativa, deben observase de la forma más favorable hacia el asegurado.

MAPFRE sostiene que las actuaciones del señor Areizaga Soto no quedan cobijadas bajo la póliza, toda vez que este actuó con

conocimiento e intención cuando comenzó un alegado patrón de hostigamiento contra los Josephs. Ahora bien, como señalamos previamente, el señor Areizaga Soto no tuvo intervenciones en su contra por parte de la policía, tampoco fue juzgado ni hallado culpable de ninguna acción criminal o responsable en la vía civil para que el foro apelado haya concluido prematuramente que es responsable de dichas alegaciones. Dicha conclusión es merecedora de un desfile de prueba en el litigio que les ocupa. En el foro apelado no se están dilucidando los alegados elementos de intención y patrón de hostigamiento empleados por el apelante.

Nótese además que, según la cláusula antedicha, **la representación legal estará presente, aunque la demanda sea infundada, falsa o fraudulenta**. Es menester destacar que este pleito surge como consecuencia del precitado litigio anterior, en donde el Tribunal de Primera Instancia, Sala Superior de Bayamón no resolvió en virtud de una moción de sentencia sumaria porque existía controversia de hechos. En adición, en el litigio existe también una reconvención instada, por lo que dichas alegaciones en contra del apelante podrían favorecerle según pueda desfilar en su turno de prueba. Es decir, si bien es cierto que la cláusula de exclusión contenida en la póliza expone que "no estarán cubiertas aquellas ofensas producto de: (1) arrestos, detención o encarcelamiento falso o procesamiento malicioso; (2) libelo, calumnia o difamación de carácter; o (3) invasión de la privacidad, desahucio injusto o entrada ilegal", no es menos cierto que estas alegaciones también son objeto de prueba según la percepción en que fueron alegadas en la demanda de los Josephs. No pueden constituirse un hecho admitido ni probado por el foro apelado. Finalmente, bajo la Cubierta L de Responsabilidad Personal, no se limita la representación legal por parte de MAPFRE, aunque la demanda sea infundada, falsa o fraudulenta. Al contrario, MAPFRE

garantizó defensa mediante abogado, y ahora quiere denegar la representación legal por las alegaciones de un tercero, arguyendo que son actos intencionales sin haberse visto en un juicio plenario. Es decir, dándolas como ciertas, privándole del contrato pactado entre la parte apelante y MAPFRE.

Examinados el recurso ante nos, y auscultando la normativa relativa al derecho aplicable procedemos a concluir que el Tribunal de Primera Instancia, Sala Superior de San Juan tomó conocimiento judicial de la disputa entre el señor *Areizaga Soto v. Los Josephs* (BY2021CV02085) para la más cabal comprensión del presente asunto. Ahora bien, el foro primario concluyó que basado en la prueba documental adjunta sometida ante su consideración, no existía controversias de hechos materiales que impidieran disponer del litigio sumariamente. De la misma forma, concluyó que las cláusulas resultaron claras y libre de ambigüedad por lo que no había un problema de interpretación. En la interpretación del foro apelado, este determinó que las alegaciones de la demanda radicada en contra del señor Areizaga Soto no estaban cubiertas por la póliza por considerarse actos constitutivos con delitos estatuidos en el Código Penal, 33 LPRA sec. 5331.

De una lectura serena de las alegaciones del expediente ante nos, según las alegaciones de los Josephs, no puede concluirse que la conducta del señor Areizaga Soto fuera intencional. Por lo que es forzoso concluir que MAPFRE venía obligado a proveerle representación legal ante el pleito instado en su contra. Incidió y abusó de su discreción el foro apelado al tomar conocimiento judicial y adjudicar dicha responsabilidad sobre el señor Areizaga Soto en un pleito que no está ante su consideración, que está pendiente ante otra sala del Tribunal de Primera Instancia y al no circunscribirse a los términos establecidos en la póliza provista por MAPFRE, donde la aseguradora se obligó a proveerle representación legal.

Adviértase que, como señalamos previamente este deber de representación legal surge cuando de una interpretación liberal de las alegaciones, existe una posibilidad de que el asegurado esté protegido por la póliza expedida. El deber de proveer representación existe independientemente del resultado del caso y de cuál sea la adjudicación final. *Echandi Otero v. Steward Title, supra,* pág. 372*.* **MAPFRE venía obligada a responder en dicha póliza y darle cubierta según sus propias cláusulas, toda vez que tal como la jurisprudencia del Tribunal Supremo de Puerto Rico ha establecido que los contratos de seguros deben interpretarse a favor del asegurado**. *SLG Francis-Acevedo v. SIMED, supra*, pág. 387. ***Se cometió el error señalado.***

Por no ser necesario discutir el segundo error señalado, prescindimos del mismo.

**IV**

Por los fundamentos antes expuestos, revocamos *la Sentencia apelada* y se devuelve al Tribunal de Primera Instancia para la continuación de los procedimientos conforme a lo dispuesto con esta Sentencia.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda.  Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones